**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JEFFREY OLSON,** | : | **Civil Action No. 1:11-CV-2383** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **WARDEN McMILLAN and** | : | |
| **ASSISTANT WARDEN** | : | |
| **LANGAN** | : | |
| | : | |
| **Defendants.** | : | |

## OPINION

### I.     Statement of Facts and of the Case

#### A.     Procedural History

This case comes before the court for resolution of the final disputed factual issues and contested legal claims advanced by the parties. This litigation, which draws to a close with this opinion, began on December 27, 2011, when the plaintiff, Jeffrey Olson, a federal prisoner, filed a *pro se* complaint against the individual defendants and the Lackawanna County Prison. (Doc. 1.)

Mr. Olson's complaint recited that the plaintiff was a federal pretrial detainee in the Lackawanna County Prison in 2011. According to Mr. Olson, during the time that he was held at the prison he suffered from a medical condition, a non-union fracture of his left tibia. Liberally construed, Mr. Olson's complaint alleged that prison

officials displayed deliberate indifference to his medical needs, and held him under conditions of confinement which violated his constitutional due process rights as a pre-trial detainee. (Id.)

Over the ensuing years the parties have extensively litigated these claims. As a result of this process, by November 2013 the remaining parties, issues and claims in this litigation had been narrowed and focused substantially. By November 2013, the only remaining defendants in this lawsuit were Warden McMillan and Assistant Warden Langan. As to these two defendants, Mr. Olson's sole remaining claim was that the defendants had violated his due process right as a pretrial detainee by housing him under unconstitutionally severe conditions of confinement. Specifically, Mr. Olson alleged that these defendants had denied him access to crutches which he needed in order to move about the prison.

In November 2013, the parties waived a jury trial as to this claim, and consented to proceed to a non-jury trial before the undersigned. (Docs. 91 and 97.) We then scheduled a pretrial conference for November 13, 2013, and conducted a non-jury trial of this remaining claim on December 13, 2013. (Docs. 90, 92, 99.) Following this evidentiary presentation, this case is now ripe for resolution. Accordingly, the court makes the following findings of fact and conclusions of law in this case.

### B.     Factual Findings

With respect to the remaining issue in this litigation regarding the conditions of the plaintiff's confinement at the Lackawanna County Prison, and the plaintiff's access to crutches during his confinement at this facility, we make the following findings of fact:

In 2011, Jeffrey Olson was charged with federal felony offenses. United States v. Jeffrey Olson, 3:11-CR-55. Mr. Olson was held as a pretrial detainee on these charges at the Lackawanna County Prison (LCP) from February 24, 2011 until May 5, 2012. Prior to his incarceration at the Lackawanna County Prison, Mr. Olson had been involved in a motor vehicle accident, and had suffered injuries, including an injury which was described as a "[l]eft tibial non union" fracture. (Pl. Ex. B.) As a result of this injury Mr. Olson periodically used crutches to assist him in perambulating.

At the time of his arrest on these federal charges on February 24, 2011, Mr. Olson was ordered detained at the Lackawanna County Prison. When he was first housed at the prison, Mr. Olson underwent an intake medical evaluation by the prison's contract medical staff. (Def. Ex. 4, testimony of Kenneth McCawley.) During this initial evaluation, medical staff noted that Mr. Olson had suffered a trauma to his left leg from a prior motor vehicle accident. Accordingly, medical staff restricted Mr. Olson from participating in prison work details and recreation, and Mr. Olson was

permitted the use of crutches. (Id.) Following this initial intake evaluation, Mr. Olson was housed in the Special Needs Unit (SNU) of the Lackawanna County Prison and remained in that unit for approximately six months. (Id.)

During this period of confinement Mr. Olson received medical care in the prison on a regular basis. The records of this on-going medical care revealed that Mr. Olson was able to walk short distances without the assistance of crutches. Thus, within a week of his intake at this facility, on February 27, 2011, prison medical staff reported that Mr. Olson was walking around the SNU without the use of his crutches. (Def, Ex. 5, testimony of Kenneth McCawley.)  Mr. Olson also reportedly advised prison medical staff that "he doesn't need them [the crutches] unless he is going a far distance." (Id.) Mr. Olson continued to walk short distances without the assistance of crutches in the Spring of 2011, while housed in the SNU, and reported to medical staff that he could walk short distances without the assistance of crutches. (Id.) Indeed, at the trial of this case, Mr. Olson advised the court that he had initially been encouraged by his treating physician to endeavor to walk without crutches for brief periods. (Testimony of Jeffrey Olson.)

Mr. Olson remained in the SNU or Assessment Unit of the Lackawanna County Prison for approximately six months until September 2011, when he was transferred to the prison's general population housing units. This transfer to general population

was approved by prison officials because by September 2011 medical staff had determined that there were no medical restrictions placed upon Mr. Olson which in any way indicated that a transfer to general population would be unsafe for him. However, the Defendants, Warden McMillan and Assistant Warden Langan, had no personal involvement in the decision to transfer Mr. Olson to a general population unit in September 2011. (Testimony of Warden McMillan, AW Langan.)

Mr. Olson remained in general housing at the Lackawanna County Prison until he was released from the facility to commence service of his federal sentence in May 2012. The housing units where Mr. Olson was confined were compact living spaces, consisting of two tiers of cells which opened onto a small common area. (Def. Ex. 10.) Immediately adjacent to the housing unit was a control, or security, office manned by prison staff. (Id.) Photographs of the housing units revealed that inmates needed to only walk a short distance to travel from their cells within the unit to the staff control office. (Id.) Moreover, within the prison meals were brought by correctional staff to the housing units. (Testimony of Warden McMillan.) Therefore, it was not necessary for Mr. Olson, or any other inmate, to walk long distances to obtain meals. (Id.)

While Mr. Olson was housed in general population, he was not permitted to keep his crutches within the housing area, where other inmates could gain access to the crutches and potentially use them as weapons. (Testimony Warden McMillan.)

Instead, the crutches were kept for Mr. Olson at the housing unit control desk, where he could retrieve them from staff upon request to assist him in walking to appointments outside of his housing unit. (Testimony of AW Langan.) This security measure of keeping the crutches at the housing unit control office was consistent with Mr. Olson's reported physical limitations that "he doesn't need them [the crutches] unless he is going a far distance." (Def. Ex. 5.) While housed at the prison, Mr. Olson followed this procedure, and gained access to these crutches at the control unit on a number of occasions when he was walking outside the housing unit, a fact that was confirmed by Mr. Olson's criminal defense counsel, Ingrid Cronin, who testified that she observed him using crutches when he would meet with her at the prison to review his case. (Testimony of Ingrid Cronin.)

This limitation upon Mr. Olson's use of crutches in the prison forms the gravamen of the sole remaining claim in this lawsuit. Yet, while this claim is central to Mr. Olson's lawsuit, the evidence at trial revealed that the Plaintiff took only very limited and halting efforts to address this concern with the defendants. Thus, while Mr. Olson testified that he tried to bring this particular complaint to the attention of Warden McMillan in written grievances, there is no record of any such written grievances. Moreover, the only testimony that Mr. Olson elicited on this point, from Correctional Officer Johnson, actually contradicted his claim of submitting grievance

notes directly to defendant McMillan since Officer Johnson simply testified to delivering some otherwise unidentified communication from Mr. Olson to the warden's office in the Spring of 2011, several months prior to Warden McMillan's appointment as warden. In short, there is no credible evidence that Mr. Olson directly communicated this concern to Warden McMillan in writing prior to instituting this lawsuit.

Furthermore, both Warden McMillan and Assistant Warden Langan testified without contradiction that it was their custom and practice to routinely walk through all of the prison housing units on a regular basis, in order to be available to address inmate concerns. Both defendants testified that at no time during the months that he was housed at the prison did Mr. Olson speak to either defendant as they made their rounds about access to his crutches. (Testimony of Warden McMillan, AW Langan.) At trial, Mr. Olson did not dispute this testimony that he never directly approached the defendants about this issue while they were in his housing unit making rounds.

Thus, there was no credible evidence that Warden McMillan played any role whatsoever in the decision to move Mr. Olson into general housing, or the decision to store his crutches at the control office in the housing unit. Further, there was no credible evidence which would permit a finding that Warden McMillan was on notice from Mr. Olson prior to the filing of this lawsuit that this arrangement was

unsatisfactory.

As for Assistant Warden Langan, his sole involvement in any issues relating to Mr. Olson's access to crutches consisted of an e-mail exchange with Mr. Olson's counsel, Ingrid Cronin, in November, 2011. During this brief exchange, Assistant Warden Langan promptly addressed a concern voiced by Mr. Olson and related to him by Mr. Olson's counsel, Ms. Cronin. Specifically, on the afternoon of November 2, 2011, Ms. Cronin wrote to Assistant Warden Langan reporting that "My client, Jeffrey Olson, tells me that he was moved from SNU overflow to general population where he cannot have his crutches." (Def. Ex. 9.) Ms. Cronin further noted that Mr. Olson had voiced a concern about access to his crutches, because he had "poor balance and cannot defend himself should the need arise." (Id.) According to Ms. Cronin's message, Mr. Olson had claimed to have addressed this issue in a grievance to the warden. (Id.)

Within minutes of the transmission of this e-mail, Assistant Warden Langan responded, advising Ms. Cronin that he would look into Mr. Olson's claims that he was being denied use of his crutches. Assistant Warden Langan further stated that he could not see any reasons why Mr. Olson could not have access to the crutches, although he found it "bothersome" that Olson was linking access to crutches to a need to defend himself. (Id.) The next morning, November 3, 2011, Assistant Warden

Langan followed up with Ms. Cronin regarding this matter, advising her that he: "spoke with the Sergeant that took [Olson's] crutches away. She explained to me that Mr. Olson only uses them for walking long distances and he never uses them in the dayroom of the block. They are available at the Officer's Station should he need them. He has been told that he only has to ask." (Id.) Following this prompt, and appropriate, response to Ms. Cronin's inquiry, the undisputed evidence shows that Assistant Warden Langan received no further inquiries, complaints, concerns or questions from Mr. Olson, or anyone representing Mr. Olson, regarding this issue until Olson filed the instant lawsuit.

It is against this factual backdrop, which we find has been established by the credible evidence presented at trial, that we will assess Mr. Olson's legal claims.

## II.  Discussion

### A.  This Due Process Claim Fails on Its Merits

As we have observed, the sole remaining claim in this lawsuit which was submitted for resolution at trial was a claim by Mr. Olson that the conditions of his confinement as a pretrial detainee were so severe that they violated the Plaintiff's constitutional rights. As the district court had previously aptly observed: "A pretrial detainee's challenge to the conditions of his confinement is. . . , brought under the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment. See

Bell v. Wolfish, 441 U.S. 520, 535-36 (1979). Under the Due Process Clause, 'the proper inquiry is whether the [challenged] conditions amount to punishment of the detainee.' Id. at 535." (Doc. 59, p.12.) Thus, this particular claim is assessed under an analytical paradigm defined by the Supreme Court in Bell v. Wolfish, supra, and subsequently refined by the United States Court of Appeals for the Third Circuit.

Viewing Mr. Olson's complaints through this analytical lens we must determine whether the conditions of his confinement proven at trial were so extreme that they amounted to punitive measures.

In making this determination:

> A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of the detention facility officials, that determination generally will turn on 'whether [the disability has] an alternative purpose ... and whether it appears excessive in relation to [that] purpose.' ... Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.' Conversely, if a restriction or condition is not reasonably related to a legitimate goal-if it is arbitrary or purposeless-a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

> Id. at 538-39, 99 S.Ct. 1861 (citations omitted).

The Supreme Court further stated that:

> In determining whether restrictions or conditions are reasonably related to the Government's interest in maintaining security and order and operating the institution in a manageable fashion, courts must heed our warning that such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.
>
> Id. at 540 n. 23, 99 S.Ct. 1861 (citations omitted). See also Block v. Rutherford, 468 U.S. 576, 584, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984) (emphasizing the "very limited role that courts should play in the administration of detention facilities").
>
> Hubbard v. Taylor, 538 F.3d 229, 232 (3d Cir. 2008).

To make this determination we must apply "a two-part test. 'We must ask, first, whether any legitimate purposes are served by these conditions, and second, whether these conditions are rationally related to these purposes.' " Hubbard v. Taylor, 538 F.3d 229, 232 (3d Cir. 2008) (citations omitted).

Applying this analytical paradigm to pre-trial detainee complaints about restrictions on access to crutches, or other mobility assistance devices, courts have frequently held that reasonable restrictions on access to such devices are wholly appropriate, are not punitive, and do not violate the due process rights of pretrial detainees. See e.g., Defreitas v. Montgomery Cnty. Corr. Facility, 525 F. App'x 170, 179 (3d Cir. 2013) ( restriction on use of crutches); Carson v. Mulvihill, 488 F. App'x

554 (3d Cir. 2012)( restriction on use of wheelchair footrests); <u>Davis v. Hall</u>, 992 F.2d 151 (8th Cir. 1993)(access to crutches). Indeed, even those cases which have identified triable issues relating to denial of access to crutches by pre-trial detainees have indicated that to prevail upon such claims the pretrial detainee must make an exacting showing, and prove that he was "deprived of the 'minimal civilized measure of life's necessities.'<u>Wilson v. Seiter</u>, 501 U.S. 294, 304, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). If so, a prison official may be held liable if he acted with 'deliberate indifference' to a substantial risk of serious harm. Mere negligence is not sufficient to establish liability. <u>Farmer v. Brennan</u>, 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Rather, the official's conduct must have been 'wanton.' " <u>Frost v. Agnos</u>, 152 F.3d 1124, 1128 (9th Cir. 1998).

Judged against these legal guideposts, Mr. Olson's conditions of confinement claim fails as a threshold matter because Mr. Olson has not shown any wanton conduct by the defendants. Quite the contrary, the evidence reveals that prison staff imposed limited restrictions upon Mr. Olson's access to crutches, restrictions which were reasonably related to prison security concerns, since the crutches could be used as a weapon in the housing unit. <u>See</u> <u>Defreitas v. Montgomery Cnty. Corr. Facility</u>, 525 F. App'x 170, 179 (3d Cir. 2013). Moreover, it cannot be said that these security concerns were fanciful, since it was reported to prison officials that Mr. Olson's concerns about

access to these crutches was inspired, in part, because Mr. Olson had "poor balance and cannot defend himself should the need arise." (Def. Ex. 9.) Furthermore, these restrictions on access to crutches, which simply required Mr. Olson to walk a short distance to retrieve them, were entirely consistent with Mr. Olson's report that "he doesn't need them [the crutches] unless he is going a far distance." (Def. Ex. 5.)

On these facts, which we find to have been established by the weight of the evidence, when we ask the two questions which animate any due process analysis of a pretrial detainee's conditions of confinement–namely, "'whether any legitimate purposes are served by these conditions, and second, whether these conditions are rationally related to these purposes,'" Hubbard v. Taylor, 538 F.3d 229, 232 (3d Cir. 2008)–we find, first, that the restriction imposed here on untrammeled access to crutches in the prison housing unit served a legitimate security purpose. We further find that this restriction was rationally related to these security concerns. Recognizing that " in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters," Bell v. Wolfish, 441 U.S. 520, 540 (1979), we conclude that Mr. Olson, therefore, has not shown that these restrictions violated his due process rights and this claim fails.

### B.     Mr. Olson Failed to Present Facts Which Would Support Supervisory Civil Rights Liability Against the Defendants

Further, Mr. Olson has not presented credible evidence which would allow for any form of supervisory liability in this case against the two supervisory prison officials he chose to name as defendants, Warden McMillan and Assistant Warden Langan. In considering claims brought against supervisory officials arising out of alleged constitutional violations, the courts recognize that prison supervisors may be exposed to liability only in certain, narrowly defined, circumstances.

At the outset, it is clear that a claim of a constitutional deprivation cannot be premised merely on the fact that the named defendants were prison supervisors when the incidents set forth in the complaint occurred. Quite the contrary, to state a constitutional tort claim the plaintiff must show that the supervisory defendants actively deprived him of a right secured by the Constitution. Morse v. Lower Merion School Dist., 132 F.3d 902 (3d Cir. 1997); see also Maine v. Thiboutot, 448 U.S. 1 (1980). Constitutional tort liability is personal in nature and can only follow personal involvement in the alleged wrongful conduct shown through specific allegations of personal direction or of actual knowledge and acquiescence in the challenged practice. Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir. 1997).

> In particular, with respect to prison supervisors it is well-established that: "A[n individual government] defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of *respondeat superior.* Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Rode v. Dellarciprete, 845 F.2d

1195, 1207 (3d Cir.1988).

Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005).

As the Supreme Court has observed:

Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior. . . .* See Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (finding no vicarious liability for a municipal "person" under 42 U.S.C. § 1983); see also Dunlop v. Munroe, 7 Cranch 242, 269, 3 L.Ed. 329 (1812) (a federal official's liability "will only result from his own neglect in not properly superintending the discharge" of his subordinates' duties); Robertson v. Sichel, 127 U.S. 507, 515-516, 8 S.Ct. 1286, 3 L.Ed. 203 (1888) ("A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed by or under him, in the discharge of his official duties"). Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.

Ashcroft v. Iqbal,  556 U.S. 662, 676 (2009).

Applying these benchmarks, courts have frequently held that, in the absence of evidence of supervisory knowledge and approval of subordinates' actions, a plaintiff may not maintain an action against supervisors based upon the misdeeds of their subordinates. O'Connell v. Sobina, No. 06-238, 2008 WL 144199, * 21 (W.D. Pa. Jan. 11, 2008); Neuburger v. Thompson, 305 F. Supp. 2d 521, 535 (W.D.Pa. 2004). Rather, "[p]ersonal involvement must be alleged *and is only present where the supervisor directed the actions of supervisees or actually knew of the actions and acquiesced in*

15

*them*. See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988)." Jetter v. Beard, 183 F. App'x 178, 181 (3d Cir. 2006)(emphasis added).

Here, Mr. Olson's proof of facts giving rise to any form of supervisory liability is entirely lacking. Entirely aside from the failure to establish any constitutional violation, Mr. Olson's evidence utterly failed to show that Warden McMillan or Assistant Warden Langan either directed or acquiesced in any wrongful conduct. Indeed, the evidence at trial was notable for what it failed to show regarding the involvement by these defendants in the actions which formed the gravamen of Mr. Olson's complaint. Neither Warden McMillan nor Assistant Warden Langan played any role in the initial decision to transfer Mr. Olson to a general housing unit at the prison. Furthermore, there was no credible evidence that Warden McMillan played any role in the decision to store Mr. Olson's crutches at the control office in the housing unit and there was no evidence which would permit a finding that Warden McMillan was on notice from Mr. Olson prior to the filing of this lawsuit about Mr. Olson's concerns regarding access to these crutches.

As for Assistant Warden Langan, his sole involvement in any issues relating to Mr. Olson's access to crutches consisted of an e-mail exchange with Mr. Olson's counsel, Ingrid Cronin, in November, 2011, during which Assistant Warden promptly, and appropriately, addressed a concern voiced by Mr. Olson. In this exchange Langan

explained to Mr. Olson, through his counsel, that he: "spoke with the Sergeant that took [Olson's] crutches away. She explained to me that Mr. Olson only uses them for walking long distances and he never uses them in the dayroom of the block. They are available at the Officer's Station should he need them. He has been told that he only has to ask." (Def. Ex. 9.)

Furthermore, to the extent that Mr. Olson's supervisory liability claims rested on the premise that officials did not after-the-fact act favorably upon his past grievances, this claim also fails for at least two reasons. First, as a factual matter, Mr. Olson has failed to establish that these officials received, but failed to timely act upon, any prior complaints. In this regard, we find that Mr. Olson has not shown by credible proof that he ever timely communicated a concern regarding his crutches to Warden McMillan. As for Assistant Warden Langan, as we have observed, he received one communication regarding this issue on November 2, 2011, and provided a complete, and completely appropriate, response within less than twenty-four hours. Therefore, this contention fails as a factual matter.

Moreover, and more fundamentally, this contention also fails as a matter of law. In this regard, it is well established that an inmate cannot sustain a constitutional tort claim against prison supervisors based solely upon assertions that officials failed to adequately investigate or respond to his past grievances. Inmates do not have a

constitutional right to a prison grievance system. Speight v. Sims, 283 F. App'x 880 (3d Cir. 2008) (citing Massey v. Helman, 259 F.3d 641, 647 (7th Cir. 2001) ("[T]he existence of a prison grievance procedure confers no liberty interest on a prisoner.")). Consequently, dissatisfaction with a response to an inmate's grievances does not support a constitutional claim. See also Alexander v. Gennarini, 144 F. App'x 924 (3d Cir. 2005) (involvement in post-incident grievance process not a basis for § 1983 liability); Pryor-El v. Kelly, 892 F. Supp. 261, 275 (D. D.C. 1995) (because prison grievance procedure does not confer any substantive constitutional rights upon prison inmates, the prison officials' failure to comply with grievance procedure is not actionable). See also Cole v. Sobina, No. 04-99J, 2007 WL 4460617, at *5 (W.D. Pa. Dec. 19, 2007) ("[M]ere concurrence in a prison administrative appeal process does not implicate a constitutional concern."). As the United States Court of Appeals for the Third Circuit observed when disposing of a similar claim by another inmate:

> Several named defendants, such as the Secretaries of the Department of Corrections or Superintendents, were named only for their supervisory roles in the prison system. The District Court properly dismissed these defendants and any additional defendants who were sued based on their failure to take corrective action when grievances or investigations were referred to them. See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988) (defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior* ); see also Antonelli v. Sheahan, 81 F.3d 1422, 1430 (7th Cir.1996) (state's inmate grievance procedures do not give rise to a liberty interest protected by the Due Process Clause).

Pressley v. Beard, 266 F. App'x 216, 218 (3d Cir. 2008).

Indeed, as to such claims, the United States Court of Appeals for the Third Circuit has recently held that summary dismissal is appropriate "because there is no apparent obligation for prison officials to investigate prison grievances. See Inmates of Attica Corr. Facility v. Rockefeller, 477 F.2d 375, 382 (2d Cir.1973)." Paluch v. Sec'y Pennsylvania Dept. Corr., 442 F. App'x 690, 695 (3d Cir. 2011).

## C.  The Defendants Are Entitled to Qualified Immunity

Finally, even if Mr. Olson had stated a colorable constitutional claim, the defendants would still be entitled to qualified immunity from these claims for damages. In order to establish a civil rights claim Mr. Olson must show the deprivation of a right secured by the United States Constitution or the laws of the United States. Satisfying these elements alone, however, does not guarantee that Mr. Olson is entitled to recover damages from these public officials. Government officials performing "discretionary functions," are insulated from suit if their conduct did not violate a "clearly established statutory or constitutional right[] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999); see also Pearson v. Callahan, 555 U.S. 223 (2009).  This doctrine, known as qualified immunity, provides officials performing discretionary functions not only defense to liability, but also "immunity from suit." Crouse v. S. Lebanon Twp., 668 F. Supp. 2d 664, 671 (M.D. Pa. 2009) (Conner, J.)

(citations omitted). Qualified immunity

> balances two important interests – the need to hold public officials
> accountable when they exercise power irresponsibly and the need to
> shield officials from harassment, distraction, and liability when they
> perform their duties reasonably. The protection of qualified immunity
> applies regardless of whether the government official's error is "a mistake
> of law, a mistake of fact, or a mistake based on mixed questions of law
> and fact."

Pearson, 555 U.S. at 231.

Determinations regarding qualified immunity, and its application in a given case,
require a court to undertake two distinct inquiries. First, the court must evaluate
whether the defendant violated a constitutional right. Saucier v. Katz, 533 U.S. 194,
201-02 (2001), abrogated in part by Pearson, 555 U.S. 223; Curley v. Klem, 499 F.3d
199, 206 (3d Cir. 2007); Williams v. Bitner, 455 F.3d 186, 190 (3d Cir. 2006). If the
defendant did not actually commit a constitutional violation, then the court must find
in the defendant's favor. Saucier, 533 U.S. at 201. If the defendant is found to have
committed a constitutional violation, the court must undertake a second, related inquiry
to assess whether the constitutional right in question was "clearly established" at the
time the defendant acted. Pearson, 555 U.S. at 232; Saucier, 533 U.S. at 201-02. The
Supreme Court has instructed that a right is clearly established for purposes of
qualified immunity if a reasonable state actor under the circumstances would
understand that his conduct violates that right. Williams, 455 F.3d at 191 (citing

Saucier, 533 U.S. at 202).

In order to find that a right is clearly established, "the right allegedly violated must be defined at the appropriate level of specificity." Wilson, 526 U.S. at 615. The Supreme Court has explained that, at least in some cases, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." Hope v. Pelzer, 536 U.S. 730, 741 (2002) (quoting United States v. Lanier, 520 U.S. 259, 271 (1997) (internal quotation marks and citation omitted)). In some cases, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Wilson, 455 F.3d at 191 (quoting Hope, 536 U.S. at 741).

The court is no longer required to conduct these two inquiries sequentially, Pearson, 555 U.S. at 239-40, and it may forego difficult constitutional issues and award qualified immunity to a defendant if it is apparent that the defendant did not violate rights that were clearly established at the time the defendant acted. Id. Where a court elects to address the alleged constitutional violations, however, the court's analysis of the merits for purposes of summary judgment merges with analysis of the deprivation of federal rights for purposes of qualified immunity. Gruenke v. Seip, 225 F.3d 290, 299-300 (3d Cir. 2000); Crouse, 668 F. Supp. 2d at 671; see also Grant v. City of

Pittsburgh, 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record . . . to establish . . . a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff).")

Applying these benchmarks, and viewing the actions of correctional staff in the light depicted by the evidence, we find that the defendants are entitled to qualified immunity in this case. In the specific factual context of pretrial detainee condition of confinement claims based upon restrictions to mobility assistance devices like crutches, courts have frequently held that reasonable restrictions on access to such devices are wholly appropriate, and are not punitive. See e.g., Defreitas v. Montgomery Cnty. Corr. Facility, 525 F. App'x 170, 179 (3d Cir. 2013) ( restriction on use of crutches); Carson v. Mulvihill, 488 F. App'x 554 (3d Cir. 2012)( restriction on use of wheelchair footrests); Davis v. Hall, 992 F.2d 151 (8th Cir. 1993)(access to crutches). Given this case law, which recognized the discretion that prison officials retain in imposing reasonable restriction on pretrial detainees' access to crutches and similar devices, nothing in the measured restrictions on access to crutches imposed here, restrictions that were completely consistent with Mr. Olson's report that "he doesn't need them [the crutches] unless he is going a far distance" (Def. Ex. 5), could have alerted these officials that their actions violated "clearly established statutory or constitutional

right[] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999). Therefore these officials are entitled to qualified immunity from damages in this case.[1]

## D. The Defendants' Counter-claim Will Also Be Denied

Finally, we note that the defendants have included in their answer to the complaint a counter-claim which seeks costs, attorney's fees, expenses and damages, "as a result of the filing of this frivolous action." (Doc. 16, p.2.) As a general matter, a complaint is frivolous only if it fails to plead "enough facts to state a claim to relief that is plausible on its face," Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007) (abrogating "no set of facts" language found in Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). The facts alleged must be sufficient to "raise a right to relief above the speculative level." Twombly, 550 U.S. 544, 555. While we find that Mr. Olson's complaint and claims were ultimately unavailing, we conclude that they were not so lacking in merit to be characterized as frivolous. Indeed, these claims required years of litigation and a trial to resolve. Therefore we will deny the defendants' counter-

---

[1] The defendants have not separately argued qualified immunity at trial, but raised the defense in their answer to the complaint, (Doc. 16, p.2, Affirmative Defense 6), and in appropriate cases this court is entitled to address this qualified immunity defense *sua sponte*, when appropriate. See Doe v. Delie, 257 F.3d 309 (3d Cir. 2001) (affirming *sua sponte* recommendation of qualified immunity by U.S. magistrate judge).

claim, which is premised upon the assertion that this lawsuit was frivolous.

### III.  Conclusion

In sum, in this case with respect to the Plaintiff's claims:

First, we find that the Plaintiff has failed to carry his burden of proof by presenting competent proof that these restriction on access to crutches violated his due process rights.

Second, we further find that the Plaintiff failed to establish proof of any supervisory liability for constitutional torts.

Third, we conclude that the defendants are entitled to qualified immunity from damages since they could not have recognized that these actions would violate "clearly established statutory or constitutional right[] of which a reasonable person would have known."  Wilson v. Layne, 526 U.S. 603, 609 (1999).

Finally, we find that the defendants have not shown that Mr. Olson's lawsuit was frivolous and therefore deny the defendants' counter-claim.

An appropriate order will issue.

So ordered this 8th day of January, 2014.


*S/Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge